**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Case NO.: 18-52904-LRC |
| WC PRIME INVESTORS, LLC | ) | |
| | ) | |
| DEBTOR. | ) | CHAPTER 11 |
| | ) | Jointly Administered |
| _____ | ) | |
| | ) | CONTESTED MATTER |
| WORTHINGTON GEORGIA | ) | |
| HOLDINGS, LLC | ) | |
| | ) | |
| DEBTOR. | ) | |

**MOTION TO DISMISS OR ALTERNATIVELY
MOTION FOR RELIEF FROM STAY**

Secured Creditor Worthington Condominium Association, Inc. (the

"Association"), requests that this Court Dismiss Debtor WC Prime Investors,

LLC's ("WCP") and Debtor Worthington Georgia Holdings, LLC's

("WGH")(WCP and WGH collectively referred to as "Debtors") chapter 11

bankruptcies for cause, on the grounds that their petitions were filed in bad faith.

Alternatively, the Association requests that this Court grant it relief from the

automatic stay to permit the Association to proceed *in rem* against the Debtors'

units (secured collateral), on the grounds that it is not adequately protected, has not

received adequate assurance of payment for utilities it provides, that the

1

Association is entitled to proceed *in rem* on the collection of post-petition new

debt, and that Debtors' bankruptcies were filed in bad faith.

## I.    RELEVANT FACTS

### The Association

1.    The Association is a mandatory Condominium Association operating

in accordance with the Georgia Condominium Act, O.C.G.A. § 44-3-70, *et seq.*

(the "Condo Act"), the Declaration of Condominium for Worthington

Condominium ("Declaration"), the Bylaws of Worthington Condominium

Association, Inc., ("Bylaws"), and the rules and regulations of the Association

(collectively, the Condo Act, Declaration, Bylaws, and rules and regulations

referred to as the "Governing Documents").

2.    The Worthington Condominium is a two building 191 unit

condominium, comprised of 188 residential units, 3 commercial units, parking

facilities and other common elements.

3.    Debtor WCP owns 33 units at the Worthington Condominium, and

Debtor WGH owns 44 units at the Worthington Condominium. (*See* Petitions).

4.    Collectively, the Debtors own approximately 41% of all residential

units at the Worthington Condominium, which they utilize exclusively as rental

properties.

5.    By virtue of their ownership of units at the Worthington

Condominium, Debtors are mandatory members of the Association, and bound by the terms of the Governing Documents. (*See* Declaration § 7, a true and correct copy is attached hereto as Exhibit "A", and O.C.G.A.§ 44-3-76).

6.     The Worthington Condominium, pursuant to the Governing Documents, is a predominately owner-occupied residential condominium, with only 25% of the residential units permitted to lease at any given time. (*See* Declaration § 15).

7.     The Governing Documents specifically grant the Association the authority to impose and collect assessments and fines, and carry out enforcement of the Governing Documents. (*See* O.C.G.A.§ 44-3-109, and Declaration § 8, pg.7).

## The State Court Action

8.     In September of 2017, the Association filed a detailed 49-page verified complaint against the Debtors and numerous others in the Superior Court of Cobb County, Civil Action File No. 17107272 (the "State Court Action"). The Association's Complaint alleged a multitude of counts, including breach of covenants, racketeering, fraudulent transfers, conversion, and civil conspiracy. (*See* State Court Action Complaint and Amended Complaint attached as Exhibit "B").

9.     In its Complaint, the Association alleged that the purported leasing permits at issue in the State Court Action were obtained by the Debtors through

fraud, and contends that the Debtors are not permitted to lease their units[1]. (*See* Exhibit B, Counts II, VI, and VII).

10.     In response to filing the State Court Action, the Debtors stopped paying their condominium monthly dues. (*See* Affidavit of Lisa Drobney attached as Exhibit "C").

11.     On or about November 1, 2017, the Debtors' former manager, Mr. Samuel Lloyd, spoke with the Association's property manager, Ms. Lisa Drobney with Homeside, and stated that if the litigation against the Debtors and himself continued, he would simply cause his units to go into foreclosure, and that he would repurchase them at the foreclosure sale. (*Id*).

12.     Prior to the filing of their petitions, the Debtors were seriously delinquent in the payment of assessments to the Association, and their former manager, Mr. Samuel Lloyd, testified at a January 12, 2018 hearing held in the State Court Action, that the Debtors owed, at the time of the hearing, approximately "$160,000 to $180,000" to the Association in base assessments, that base assessments on Debtors' units are "approximately $38,000 per month or $39,000" and that "there is no dispute on the base assessments." (*See* January 12,

---

[1] The Debtors denied all allegations raised in the State Court Action, and specifically contend that the entities have valid and enforceable leasing permits, on the basis that the leasing permits were validly issued, and that even if they were not, all units owned by Debtor WCP were obtained through foreclosure, which would generally exempt those units from the communities leasing covenants.

2018 Hearing Transcript, 14:5-21, 17:5-9, 50:21-25, 51:1-7, 54:20-24, 57:6-17

filed concurrently herewith).

13.    Between January and March of 2018, representatives of the Debtors,

including Samuel Lloyd and other insiders, began circulating emails titled

"Worthington Doomsday," in which they forecasted that the Association would be

bankrupt between March and April of 2018. A true and correct copy of some of

these emails are attached as Exhibit "D".[2]

14.    In response to the Debtors' continued refusal to pay any amounts

owed to the Association, the Association, on February 2, 2018, amended its

Complaint in the State Court Action to add counts for unpaid assessments, judicial

foreclosure, and fraudulent transfers[3]. (*See* Exhibit B, Amended Complaint).

15.    On February 14, 2018, the Association filed its *Motion for Partial

Summary Judgment and Order Allowing Judicial Foreclosure and Brief in

Support*, in which it sought an order permitting the foreclose on its statutory liens

against the Debtors' units. A true and correct copy of the Association's summary

---

[2] The emails originated from Mr. Goodrich Booth Pratt, a/k/a GB Pratt, a/k/a Bill Pratt. Although Mr. Pratt is not believed to be an owner or insider of the Debtors, he has continually acted as a surrogate for the Debtors within the Worthington Community. Mr. Pratt is a disbarred attorney (State of Michigan) who was previously convicted of a felony in Florida for grand theft, in Collier County Circuit Court, Twentieth Judicial Circuit, State of Florida, Case No. 86547CFACTC.

[3] The fraudulent transfer claims are currently being investigated by the Chapter 7 Trustee in a companion case involving the Debtors' predecessor in interest, GMNC Investments, LLC, in Case No. 18-51282-BEM.

judgment motion is attached as Exhibit "E."

16.    A week later, on February 21, 2018, and in response to the
Association's summary judgment motion, the Debtors filed for bankruptcy
protection.

## The Debtors' Bankruptcy

17.    In their Petition's both Debtors identify their businesses as single asset
real estate. (*See* Debtors' Petitions).

18.    Debtor WCP's Petition lists 4 secured creditors, with secured debts
amounting to $4,206,248.73, and 6 unsecured creditors with unsecured debts
amounting to $226,438.16 (about 5% of secured debt).

19.    Debtor WGH similarly lists 4 secured creditors, with secured debts
amounting to $4,709,410.83, and 6 unsecured creditors, with unsecured debts
amounting to $223,726.98 (about 5% of secured debt).

20.    Debtor WCP's petition provides a valuation of its sole asset, 33 units
at the Worthington Condominium, at $3,679,669.57.

21.    Debtor WGH's petition provides a valuation of its sole asset, 44 units
at the Worthington Condominium, at $4,220,000.00.

22.    At the time of their filing, Debtors were not yet 30 days delinquent in
their payments to Sehal III, LLC, their largest secured creditor.

**The Association's Provision of Utilities**

23.     The Association provides numerous utility services to the Debtors'
units, which are necessary, and which are not otherwise obtainable, including
water to every unit, electricity to the common areas, elevator maintenance and
inspections, fire safety inspections, security, trash removal, and many other
services.

24.     Neither of the Debtors have offered, nor furnished to the Association,
adequate assurance of payment for the continuation of necessary and beneficial
utility services to the Debtors' units.

25.     In addition to their refusal to pay for services that the Debtors could
not otherwise obtain elsewhere, they have refused to pay anything for post-petition
monthly assessments, which continue to accrue as new debt at approximately
$38,000 per month, as of this pleading, the Debtors owe approximately $72,000 in
post-petition base assessments, and several times that in fines and other charges.[4]

## II.   ARGUMENT AND CITATION TO AUTHORITY

The Debtors filed for bankruptcy in bad faith, are continuing to accrue post-
petition debt at a rapid rate, and have failed to offer any adequate assurance to the
Association for necessary utilities provided by the Association nor provided

---

[4] The Association contends that due to several covenant violations, including unauthorized
leasing, the monthly amounts incurred by the Debtors for fines and other charges are
substantially higher than the base assessments of approximately $38,000, which are not disputed.

7

adequate protection to the Association on its statutory lien. The Debtors will not be able to reorganize without a significant influx of capital to bring many of their units back into operation; but most importantly, they are not entitled to lease under the Association's Governing Documents.

For these reasons, the Association requests that Debtors' bankruptcies be dismissed with prejudice, or alternatively, that the Association be granted relief from the stay to pursue its claims in the State Court Action and its *in rem* remedies against the Debtors' property to which the Association's statutory liens pertain.

## A.    STANDARD

"It is well-settled that the court may dismiss a Chapter 11 case, . . . if the debtor is unable to achieve confirmation or if the petition itself was filed for an improper purpose, such as filing to halt a creditor's collection efforts without the intent or ability to reorganize." *In re Lezdey*, 332 BR 217 (2005). The condition of good faith permeates virtually every aspect of a bankruptcy case, and if a debtor filed for bankruptcy in bad faith, the case should be dismissed under 11 U.S.C. 1112(b).  *In re Albany Partners, Ltd.*, 749 F.2d 670 (1984); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (1988); *In re State Street Houses, Inc.*, 356 F.3d 1345 (2004).

1.    **The Debtors' filed for bankruptcy protection in bad faith, and their cases must be dismissed with prejudice.**

11 U.S.C. § 1112(b) permits this Court to dismiss Debtors' Chapter 11 cases for cause, including bad faith, and in making such determinations courts emphasize whether there is an intent to abuse the judicial process, and the purpose of the reorganization provisions, or where factors evidence that a petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights. *In re Albany Partners, Ltd.*, 749 F.2d at 674.

The 11th Circuit has a long-established set of factors for determining if a debtor's case, in a single asset real estate case, is filed in bad faith. These factors are colloquially known as the *Phoenix Piccadilly* factors, and consist of the following:

i.    The Debtor has only one asset, the property at issue;

ii.    the debtor has few unsecured creditors whose claims are relatively small compared to the claims of the secured creditors;

iii.    the debtor has few employees;

iv.    the property is subject to a foreclosure action as a result of arrearages on the debt;

v.    the debtor's financial problems essentially are a dispute between the debtor and the secured creditors which can be resolved in the pending state court action; and

vi.    the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

9

*In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393; *In re State Street House, Inc.*, 356 F.3d 1354, 1346 (2004).

In *Phoenix Piccadilly* and subsequent cases applying the *Phoenix Piccadilly* factors, the facts are almost identical to the ones in the present case. A single asset real estate debtor files for bankruptcy protection in response to a pending foreclosure or other adverse ruling in a state court action, the debtor has few employees, their unsecured debts are minor compared to their secured debts, their financial difficulties are the result of the collection activity by the secured creditor, and the filings are conveniently timed to avoid a pending state court ruling and/or foreclosure. *See In re Lezdey*, 332 B.R. 217 (2005); *In re Gold Rush II, Inc.*, 2006 WL 8433208; *In re Kollar*, 357 B.R. 657 (2006); *In re state Street Houses, Inc.*, supra; *Colonial Daytona Ltd. Partnership v. American Sav. of Florida, F.S.B.*, 152 B.R. 996 (1993).

Importantly, not all of these factors need to be present, only several of the factors occurring together can indicate a bad faith filing. *Colonial*, 152 B.R. at 1001. Applying the *Phoenix Piccadilly* factors to the present case, it is strikingly apparent that the Debtors filed for bankruptcy protection in bad faith.

     **i.**     **Debtors only have one asset, the property at issue.**

As is evident from the Debtors' Petitions, each Debtor has only one asset, the units located at the Worthington Condominium, which is the only property at

issue.

### ii. Debtors have few secured creditors, whose claims are miniscule compared to secured creditors' claims.

Both Debtors' stated unsecured debts constitute less than 5% of their secured creditors' debts. The Association is a secured creditor, pursuant to O.C.G.A. § 44-3-109, and is second in priority only to Sehal III, LLC's security deed and any unpaid property taxes, assuming Sehal III, LLC is not an insider, which the Association suspects may be the case.

In *Lezdey*, the court determined that two debtors who filed for Chapter 11 did so in bad faith to avoid an unsecured judgment creditor who was actively seeking to collect on the judgment, where the debtors' other debts were minor compared to that of the judgment creditor, and only the judgment creditor was actively seeking to collect on its debt through judicial process. *In re Lezdey*, 332 B.R. at 223. In similar fashion, the Association is the only secured creditor that was not being paid pre-petition, is the only secured creditor not being paid post-petition, and is the only secured creditor pressing the Debtors with litigation for the collection of amounts owed. This leads to the inescapable conclusion that Debtors filed their bankruptcy cases solely to avoid the Association's collection actions in the State Court Action.

### iii. Debtors have one employee, at best.

The Debtors have no employees. At the 341 creditor, the Debtors' manager,

Mr. Roberts, testified that the Debtors have no employees.

### iv.   Debtors' sole assets are the subject of a pending foreclosure action in the State Court Action.

The Debtors conveniently filed for bankruptcy protection a mere week after the Association filed its summary judgment motion seeking a judicial foreclosure order on undisputed amounts owed to the Association. The Debtors' former manager, Mr. Samuel Lloyd repeatedly admitted that the Debtors owed base assessments to the Association in the State Court Action. Mr. Lloyd testified that at the time, January 12, 2018, the Debtors: (1) collectively owed about $180,000 in base assessments to the Association; (2) collectively owed about $38,000 in base assessments each and every month; and (3) that the Debtors do not dispute the base assessments. (*See* State Court Action, January 12, 2018 Hearing Transcript, 14:5-21, 17:5-9, 50:21-25, 51:1-7, 54:20-24, 57:6-17).

The Debtors do dispute other charges and amounts owed, such as fines for leasing violations, but the Association's summary judgment motion was only based on the base assessments owed. In response to the Association's summary judgment motion, and the likely granting of a judicial foreclosure order, the Debtors filed for bankruptcy protection. Stopping the State Court Action is the sole reason why the Debtors filed for bankruptcy protection. Thus, their filings were in bad faith.

     **v.**    **Debtors' financial problems are a direct result of their dispute with the Association in the State Court Action, which should be resolved in the State Court Action.**

The only reason why the Debtors are experiencing any financial difficulties, is due to their dispute with the Association. The Association sued the Debtors and others in the State Court Action, for a multitude of claims. Thereafter, the Debtors intentionally stopped paying their monthly dues in an attempt to apply financial pressure on the Association to dismiss the case. This forced the Association to seek collection of amounts owed through remedies afforded to it in the Governing Documents, including rent assignments from the Debtors' tenants, suspension of parking and other common element use privileges, and ultimately the amending of the Association's Complaint and the filing of a summary judgment motion seeking a judicial foreclosure order.

When asked why the Debtors filed for bankruptcy at the 341 creditor meeting, Mr. Roberts stated that it was in response to the Association's "aggressive collection" activity. The sole reason they filed bankruptcy, was to stop the Association from pursuing its state law claims.

The Debtors' Amended Statements of Financial Affairs support this fact, as the entities collectively claim to have generated over $1,000,000 ($616,596.06 for WGH, and $391,123.24 for WCP) in revenue for 2017, which decreased significantly after the Debtors stopped paying their monthly dues and the

Association began its legitimate collection activities. The Debtors' financial

problems are a direct result of the dispute between the Association and the

Debtors. The Debtors' bankruptcies are a last ditch attempt to frustrate and delay

the State Court Action, and pending foreclosure, while they attempt to outlast the

Association financially.

     **vi.**     **Debtors conveniently filed their bankruptcy only after the Association sought foreclosure of its statutory liens, in a blatant attempt to frustrate and delay the foreclosure.**

The timing of Debtors' bankruptcy cases further demonstrate their desire to

frustrate and delay the Association's attempts to foreclose its liens on their only

assets. A week after the Association sought a judicial foreclosure, the Debtors file

for bankruptcy protection. As stated above, the unpaid base assessments owed to

the Association by the Debtors are undisputed.

This is unsurprising since Debtors' former manager stated his intention to

file for bankruptcy protection if a foreclosure action was filed against the entities:

"Should they choose to announce foreclosure, my responsibility will be to file for

protection under federal bankruptcy court to stay that foreclosure, to protect as

much of the shareholder value as possible and to give these other claims a chance

to play out in court, which likely would take at least a year." (*See* January 12, 2018

Hearing Transcript, State Court Action, 59:25-25, 60:1-4).

The Debtors' stated intention is to outlast the Association, to frustrate and

stall the Association from enforcing its state law rights, in the hopes that the

Association will be forced into bankruptcy and be unable to pursue its claims

against the Debtors, their affiliated entities and insiders. The Debtors have a literal

"Doomsday" clock, tracking the Association's spending and making predictions on

how long until the Association is insolvent. (*See* Exhibit D). This is the essence of

bad faith.

### vii.    The Debtors have no realistic possibility of effective reorganization.

Even though some courts consider a debtor's chances of reorganization in

determining whether a motion to dismiss is appropriate, it is not heavily considered

when determining whether a debtor has filed in bad faith. *In re Phoenix Piccadilly,*

*Ltd.*, 849 at 1394 (holding that "the prospects of a successful reorganization do not

override, as a matter law, the finding of bad faith").

Assuming *arguendo*, that the Debtors' chances of reorganization are relevant

to a determination of bad faith, the Association contends that their chances of a

successful reorganization are impossible, for two reasons: (1) successful

reorganization is predicated on their ability to lease, which they cannot do under

the Governing Documents, and (2) even if they could lease their units, the Debtors

cannot generate enough revenue to reach a feasible plan.

## 1. The Debtors are not permitted to lease their units, which bars any chance of reorganization.

One of the reasons for the dispute in the State Court Action is the Association's contention that the Debtors are improperly leasing their units, in violation of the community's Governing Documents. By filing for bankruptcy, the debtors are misusing judicial process to violate the community's leasing restrictions, and avoid the State Court Action. They are doing this while not paying the Association anything for the valuable and necessary services that it is required to provide. This is the epitome of inequity.

The Debtors' only have one asset, the units located at the Worthington Condominium. Their only revenue is rental income from those units. Simply put, if they cannot lease, they have no chance of reorganizing or continuing as a going concern. As such, Debtors' bankruptcy cases should be dismissed so that the issue of unauthorized leasing can be further litigated in the pending State Court Action.

The State Court Action is best suited to determine those issues, and it would be unduly prejudicial and prohibitively expensive to litigate those claims from scratch through the bankruptcy system. This is especially true where the Debtors have filed in bad faith, solely to avoid a detrimental ruling in the State Court Action.

16

**2.    Even if the Debtors could validly lease their units, they
cannot generate enough revenue to effectively reorganize.**

The Debtors desire to lease their units free from interference from the
Association, utilize rental income to rehab other units, and eventually start paying
their debts once they reach a certain level of profitability. At the 341 creditor
meeting Mr. Roberts testified that the entities are not profitable unless they have an
occupancy rate near or above 90%. Mr. Roberts also testified that only 22 or 23 of
Debtor WCP's 33 units are occupied, of those occupied, the delinquency rate is
about 50%; and that about 35 ("mid-thirties") of Debtor WGH's 44 units are
currently occupied, but he was uncertain as to the delinquency rate for WGH's
occupied units.

Assuming the Debtors were permitted to lease their units, which they are
not, a plan for reorganization is simply not feasible. According to the Debtors' cash
collateral budgets, neither is capable of meeting its basic operating expenses, let
alone servicing any of their outstanding debts (pre or post-petition).

Their cash collateral budgets list total revenue for the two entities as
$61,393.70, and the Debtors list their monthly operating expenses as follows:

| | |
|---|---|
| Property and General Liability Ins. | $1,353.72 |
| Property Taxes | $4,976.75 |
| Property Management Fee | $8,539.37 |
| Maintenance and Repairs | $2,475.00 |
| Manager Salary | $5,000.00 |
| Lender Payments (adequate assurance) | $24,000.00 |
| U.S. Trustee Fee | $650.00 |

| | |
|---|---|
| Storage Unit Rentals | $1,100.00 |
| Pest Control | $600.00 |
| **Total (without post-petition COA Dues)** | **$48,694.84** |
| **With post-petition COA dues ($38,000)** | **$86,694.84** |

Importantly, these numbers only assume cash collateral payments to the lender, Sehal III, LLC, in the form of adequate assurance payments, and not the actual debt servicing payments they are supposed to be making, approximately $33,000 per month. The Debtors continue to incur post-petition new debt in the amount of $38,000 per month (not including fines and other disputed charges), just for unpaid condominium assessments.

In order for the Debtors to cover basic operating expenses and post-petition new debt, they would have to generate a minimum of $96,000 each and every month. These numbers do not account for any prepetition debts or any of the substantial renovations the entities must make to get a dozen or more of their units back into operation, which the Debtors contend is about $600,000. The money needed to fund any reorganization plan must be derived from unauthorized leasing activity, a capital infusion, or DIP financing. Mr. Roberts testified at the 341 meeting, they have no plans for DIP financing.

If the reorganization funds are derived from improper leasing, and the State Court Action determines that the Debtors cannot lease, the Debtors' units will be liable for a $750 per unit per month fine, dating back to the fall of 2017. For the Debtors to have any chance whatsoever to continue as a going concern, the issues

in the State Court Action must continue to be litigated, in the forum best suited to make those determinations. A ruling in the State Court Action will likely render Debtors' bankruptcies moot.

For these reasons, the Association requests dismissal of Debtors' cases for cause is appropriate pursuant to 11 U.S.C. 1112.

**2.      Alternatively, the Association moves for relief from the automatic stay.**

Alternatively, this Court should grant the Association relief from the automatic stay under 11 U.S.C. § 362(d), for four reasons, (i) the Debtors are incurring post-petition new debt, at a rate of $38,000 per month (at a minimum), and the Association must be granted relief from the automatic stay to pursue its *in rem* remedies; (ii) the Debtors are failing to pay the Association adequate assurance payments for the provision of necessary utilities, as required under 11 U.S.C. § 366; (iii) the Debtors have filed bankruptcy in bad faith; and (iv) the Association, as a secured creditor, is not adequately protected.

11 U.S.C. § 362(d) permits this Court to grant relief from the automatic stay for cause, including bad faith, lack of adequate protection, lack of adequate assurance, and to permit a secured creditor to pursue *in rem* remedies in connection with post-petition new debt. 11 U.S.C. § 362(d); 11 U.S.C. § 366; *In re Hall*, 454 B.R. 230, 233-242 (2011); *In re Albany Parnters, Ltd.*, 749 F.2d 670, 673 (1984).

**i.      Relief from the automatic stay is necessary, because Debtors' post-petition condominium assessments are not protected by the**

19

**automatic stay, and the Association must seek relief from stay in order to enforce its *in rem* rights to collect on post-petition debt.**

The automatic stay *does not* protect against acts to collect or recover post-petition debts, including post-petition condominium assessments, but a creditor seeking to exercise control over the property of the estate to pursue *in rem* remedies on post-petition new debt, such as suspension of use privileges and foreclosure, must seek relief from the automatic stay. *In re Hall*, 454 B.R. at 233 ("Continuing to default on post-petition payments is not protected by the bankruptcy laws. The Debtor's fresh start entitles her to relief under her confirmed plan, but that fresh start does not and should not encourage further defaults."); 11 U.S.C. § 362(a)(3).

In Georgia and the 11th Circuit, condominium assessments are covenants running with the land, created pursuant to covenants and state law, and post-petition assessments that become due and payable after the filing of a bankruptcy petition do not constitute claims for the purposes of the automatic stay. *In re Hall* at 233-241 (finding that post-petition condominium assessments are not claims and are not subject to the automatic stay); *Timberstone Homeowners' Ass'n, Inc. v. Summerlin*, 266 Ga. 322, 232-24 (1996).

In *Hall*, the court provided an extensive and well-reasoned analysis of how post-petition condominium assessments are treated in the context of bankruptcy. Citing extensive Georgia law, the court found that condominium assessments are

not contractual in nature, but rather an obligation that runs with the land, and are not based on debts, but rather, on an allocation of liabilities for common expenses that are periodically assessed and become due on an annual or monthly basis. *In re Hall*, at 241. The court further reasoned that the obligation to pay assessments does not exist until the assessments are actually due. *Id.*

In the present case, condominium assessments become due and payable on the 1st of every month, are considered late on the 10th day of the month, and if not paid they incur a late charge of 10% of the amount due. Additionally, interest at a rate of 10% per annum accrues on all delinquent amounts owed. Principal assessments, late fees, interest, and reasonable attorney's fees incurred, automatically become a statutory lien against the unit to which such amounts are owed. (*See* Exhibit B, Declaration § 10; O.C.G.A. § 44-3-109). Debtors admit to owning approximately $38,000 in undisputed base assessments each month, yet have paid only about $4,500 in post-petition amounts to the Association.

Although collection efforts for post-petition assessments would not violate the automatic stay, the Association's only effective remedies to collect do require relief from the automatic stay, because those remedies require exercising control over the property of the estate. These remedies include suspension of common element use privileges (parking, pool access, etc.), suspension of utilities paid for

as a common expense, and foreclosure of the Association's statutory liens. (*See* Declaration, § 10(c); Bylaws, Art. I § 6; O.C.G.A. § 44-3-76).

These remedies are expressly provided for in the Governing Documents and codified by state law. Thus, the Association is entitled to relief from the automatic stay to pursue all available remedies to collect unpaid post-petition assessments.

### ii. The Debtors' failure to provide adequate assurance for utility services provided by the Association warrants immediate relief from the stay.

11 U.S.C. § 366(c)(2) permits a condominium association who provides utility services to a Chapter 11 debtor to alter, refuse, or discontinue utility services, if during the 30-day period beginning on the date of the filling of the petition, the association does not receive from the debtor adequate assurance of payment for utility service that is satisfactory to the association. Condominiums that provide monopolistic services that cannot be otherwise obtained by a debtor are considered utilities. *In re Spence*, 545 B.R. 280, 293 (2016); *In re Hobbs*, 20 B.R. 488, 489-90 (1982).

The Association provides numerous services that directly benefit the Debtors, which they would not otherwise be able to obtain. The Association provides water to every unit, electricity to the common elements, inspection and maintenance of elevators and fire suppression systems, security, trash removal, and many other utility type services. To date, the Debtors have only paid

22

approximately $4,500 for the provision of these post-petition services that the Association is required to provide, but are reaping the benefits of those services.

Therefore, the Association requests relief from the automatic stay to terminate all utilities to the Debtors units, including water, unless and until the Debtors promptly provide continual payments for their share of those utilities, and the Association stands ready, willing, and able to provide evidence of what those amounts should be.

### iii.   The Association should be granted relief from the automatic stay due to Debtors bad faith.

"The automatic stay may be terminated for cause pursuant to 11 U.S.C. § 362(d)(1) if the petition was filed in bad faith." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (1988)(internal citations and quotations omitted). As discussed at length above, the Debtors filed their petitions in bad faith, solely to avoid the Association's State Court Action, and pending foreclosure.

Thus, even if the Court denies the Association's motion to dismiss, the Association should still be granted relief from the automatic stay due to the Debtors bad faith in filing bankruptcy solely to avoid the Association's legitimate collection activity in the State Court Action. To do otherwise would be extremely inequitable in light of the demonstrable evidence.

### iv.    Relief from the automatic stay is necessary because the Association's security is not adequately protected.

The Debtors have no equity in their units, their Petitions state a collective generous valuation of $7,899,669.57 for their units, with understated secured debts amounting to $8,915,659.56. Both Debtors additionally list several speculative and contingent claims as potential windfalls. Setting aside speculative claims, and even assuming their generous valuation, there is no equity in Debtors' assets, they are upside down by over a million dollars.

Further, the Association, as a second position secured creditor, pursuant to O.C.G.A. § 44-3-109, is not adequality protected because the units are not worth what the Debtors claim. According to the Debtors' Petitions, their 77 units are collectively worth $7,899,669.57 or approximately $102,600 per unit. This is an unrealistic valuation of the units because of the state of disrepair in a majority of the Debtors' units, and the fact that a dozen or more need extensive repairs just to make them functional, let alone sellable, the units are worth a fraction of what the Debtors claim. The Association estimates the actual value of Debtors' units to be in the $45,000 - $55,000 range, for a total estimated valuation of approximately $4,235,000 or less.

In looking at the Debtors secured debt in order of likely priority, it is easily determined that the Association is severely under secured. Cumulatively, property taxes and Sehal III, LLC's interest amount to $4,233,172.49. The Association's

pre-petition secured claims collectively exceed $650,000. With a realistic

valuation, most if not all of the Association's claims are under secured,

necessitating relief from the stay.

      With no equity and no ability to lease to generate additional revenue, they

cannot satisfy all their secured creditors claims and should not be in a Chapter 11.

Therefore, the Association, pursuant to 11 U.S.C. § 362(d)(3) requests relief from

the automatic stay.

## B.    CONCLUSION

      For the above reasons, the Association respectfully requests that the Debtors

bankruptcies be dismissed with prejudice, or alternatively that the Association be

granted stay relief so as to pursue its state law claims, suspend utility services, and

seek *in rem* relief in the State Court Action.

      Respectfully submitted this 17th day of April, 2018.

           POOLE HUFFMAN, LLC

           */s/ Jon David W. Huffman*
           Jon David W. Huffman
           Georgia Bar No. 937966
           Scott B. McMahan
           Georgia Bar No. 706240
           Timothy J. Guilmette
           Georgia Bar No. 624309
           315 W. Ponce de Leon Ave., Ste. 344
           Decatur, GA 30030
           (404) 373-4008
           jondavid@poolehuffman.com
           tim@poolehuffman.com

Attorneys for Worthington Condominium
Association, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the **MOTION TO DISMISS OR ALTERNATIVELY MOTION FOR RELIEF FROM STAY** using the CM/ECF system, which will automatically send email notification of such filing to the following:

Will B. Geer
Attorney for Debtor
wgeer@wiggamgeer.com

I hereby certify that on this date, I served a copy of **MOTION TO DISMISS OR ALTERNATIVELY MOTION FOR RELIEF FROM STAY**, on the following parties on the attached Mailing Matrix:

This the 17th day of April, 2018.

POOLE HUFFMAN, LLC

/s/ *Jon David W. Huffman*
Jon David W. Huffman
Georgia Bar No. 937966
Timothy J. Guilmette
Georgia Bar No. 624309
315 W. Ponce de Leon Ave., Ste 344
Decatur, GA 30030
(404) 373-4008
jondavid@poolehuffman.com
scott@poolehuffman.com
tim@poolehuffman.com
Attorneys for Worthington Condominium
Association, Inc.

Shawn D. Stafford, Esq.
Neel, Robinson & Stafford, LLC
5555 Glenridge Connector
Suite 400
Atlanta, Georgia 30342
Attorney for SEHAL III, LLC
shawn.stafford@nrs.law

Office of the U.S. Trustee
362 Richard B. Russell Building
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
USTP.Region21@usdoj.gov
ustpregion21.at.ecf@usdoj.gov

Baldwin Crest Group, LLC
570 Piedmont Ave, NE
Atlanta, GA 30308

Braintree Holdings 26, LLC
675 Ponce de Leon, Ave, NE
Suite 8500
Atlanta, GA 30308

Cobb County Tax Commissioner
736 Whitlock Ave
Marietta, GA 30064

Coleman Talley, LP
3475 Lenox Rd, NE, Ste. 400
Atlanta, GA 30326

Georgia Department of Revenue
Compliance Division, ARCS
Bankruptcy
1800 Century Blvd, NE, Ste. 9100
Atlanta, GA 30345

Internal Revenue Service
P.O. Box 7346
2970 Market Street
Philadelphia, PA 19104

Ken Blankenship
6207 Costa Lanier Ln
Flowery Branch, GA 30542

Lindsay P. S. Kolba
Office of U.S. Trustee, Ste. 362
75 Ted Turner Dr., S.W.
Atlanta, GA 30303

Daniel M. McDermott
United States Trustee, Ste. 362
75 Ted Turner Dr., S.W.
Atlanta, GA 30303

Sam Lloyd
675 Ponce de Leon Ave., NE
Suite 8500
Atlanta, GA 30308

Secretary of the Treasury
15th & Pennsylvania Ave., NW
Washington, DC 20200

Sehal III, LLC
1718 Peachtree St., NW, Ste. 276
Atlanta, GA 30309

ServPro
3850 Canton Rd., Ste. 3114
Marietta, GA 30066

U.S. Securities and Exchange
Commission
Office of Reorganization, Ste. 900
950 East Paces Ferry Rd, NE
Atlanta, GA 30326

Venture South Development II,
LLC
4485 Tench Rd., SE, Ste. 1220
Suwanee, GA 30024

Veritext Corp.
c/o Corporation Service
Company
0 Technology PKWY South
#300
Norcross, GA 30092

WH2, Inc.
1960 Spectrum Circle, Unit 100
Marietta, GA 30067

Worthington Georgia Holdings,
LLC
1960 Spectrum Circle, Unit 100
Marietta, GA 30067

Georgia Department of Revenue
Bankruptcy Section
P.O. Box 161108
Atlanta, GA 30321